The last argument on the calendar for today is in Case No. 24-1052, SEC v. Alitron. Good morning. May it please the Court, my name is Joseph Pastore, and I represent, along with my firm, Pastore LLC, my colleague Tyler Rutherford here today, appellants Bernard Findley and Alitron Inc. This case arises from an action brought in the District of Connecticut by the Securities and Exchange Commission alleging fraud under federal securities laws. It raises several interesting issues for this panel with respect to the burgeoning law of disgorgement and civil penalties in SEC cases. The SEC alleged that Mr. Findley and Alitron issued fraudulent press releases relating to the company's prospects and audits. After a trial in January of 2023, a jury found the defendants liable for publishing press releases containing fraudulent statements. Importantly, and significantly for this case, over a year later, Judge Underhill, who I have great respect for, issued a 28-page memorandum of decision and permanent injunction in February of 2024 based on new and critical new facts. As set forth in our opening brief, we raise six issues. I'm going to primarily focus the oral argument, obviously happy to answer any questions, on the issue of disgorgement under Lew and Goebel and the issue of civil penalties in light of the Supreme Court's recent decision in J. Arske. I may have mispronounced that, I apologize. With respect to disgorgement, we believe the district court clearly made an error after the SEC admitted that it could not locate any victims. Okay, but what is the legal relevance of them? They went back and changed their mind. Like, would we have them if they figured out they were wrong? Would we have them stick with the same position? No, I understand. It's not their fault. Goebel came out, and they were left with sort of a developing new standard, and so they needed to meet that standard. My argument with the judge's approach on disgorgement is not only that I don't think it followed Goebel, but that the process didn't satisfy due process. The critical facts in this case were presented to the court in a simultaneous last submission. None of those facts were ever presented to the jury. They were never subject, and this is someone who litigates in court, to cross-examination. The affidavits from, obviously, a very bright person, Georgetown, four years out of college, never on the stand. Never one witness questioned about the holdings, not the holdings, anything like that. So my issue that I'm raising for this court is not just the misapplication of the law, but the misapplication of the process. I do not blame the SEC for realizing they could not perceive the way they wanted to once this court issued the Goebel decision. They couldn't. They had to do something different. But I don't think what was done was sufficient, both from a legal perspective and a process perspective. And I think the Supreme Court's recent decision in GRC only emphasizes that. As that case talks about- What is the relationship between Gerharcy and Toll? Yeah, very good point. And I think our brief does not do a good enough job on this. GRC, I apologize for the pronunciation, essentially stands for the proposition that the administrative law judges of the SEC could not hear certain cases because the parties had a right to a jury. And I think that does lead into this case. But that case, the Gerharcy case, does refer to Toll on many occasions, saying that the jury should hear the facts and make a determination of the liability. And deferring to Toll, the judge gets to issue the penalties. I think the difference here- and I disagree with the SEC. I definitely think Gerharcy is relevant to this analysis. I think it's relevant for sure. But in Toll, Toll doesn't say the judge then finds new facts. Toll case, which talks about, I think, the Clean Water Act and some of the intricacies of assessing penalties, doesn't give liberty to the judge to then find and use new facts without cross-examination, with no due process, in order to create the penalty. I concede that the Toll case says the judge does the math. There's sophisticated calculations. The judge does the assessment of the penalties. It doesn't say on new facts, on evidence that wasn't presented to the jury, on evidence that wasn't subject to cross-examination. So the interrelationship, I don't think we sufficiently articulate that in the brief, and I think the SEC is absolutely correct to have pointed that out. But I don't think that changes the analysis. Just because the judge does the assessment of penalties, doesn't mean the judge can do it without due process, great respect to Judge Underhill, or without cross-examination, or without the jury hearing the same facts. Essentially, in this case, we have the judge relying upon facts to find disgorgement and civil penalties that the jury never heard. And the facts that the judge relied upon, there was never cross-examination of that witness. And I submit to you, and I've got the affidavit here, if you read the affidavit, it's wholly insufficient. It doesn't tell you who bought what. It doesn't tell you when. It doesn't tell you when they lost money, how they lost money, whether they relied on the press releases. If this young person was on the stand, I'd cross-examine him for an hour and elicit all that for the benefit of the judge or the jury. I'm sorry. Is your due process argument the same as your Seventh Amendment argument? Or they seem to be blending together, and I'm not quite sure. Fair. I don't think it's the same. My due process argument has to do with the specific facts in this case as to how the process was handled with respect to disgorgement and, I guess, civil penalties. But then I heard you saying that the problem with the process was that the jury didn't get to decide. Under the civil penalties piece of it, the judge can assess the civil penalties. True. Tull says that. The judge does the math. But it doesn't say under new facts that the jury never heard on new facts that we're not subject to cross-examination. And that's my point. So they are a little interrelated. I think what Judge Clark is asking is, so is that your Seventh Amendment argument, or is that your due process argument? I think it's both. It's due process because I've articulated the lack of process. It's also Seventh Amendment because the jury in the case should hear all the facts upon which the judge issues the penalties. So I think it's both. It's process. The process was insufficient and not sufficiently fulsome to allow for cross-examination, et cetera. And then the judge is making decisions based on facts that were never even presented to the jury. And so, therefore, I think that deprives my client of the right under the Seventh Amendment on a jurisprudence test to present the entire case. On your sufficiency argument, just so I'm clear, to win, you have to win that it was insufficient. There was insufficient evidence for all 13 statements. Is that right? I think what we have to win is under Goebel for disgorgement of the entire case. No, no, I'm going to. I know you wanted to start with disgorgement, but I'm asking about your sufficiency argument. Yes. That's correct. We would have to demonstrate to this court that in order to win, we would have to demonstrate that each of those statements didn't meet materiality, scienter, fulsome, et cetera. And we stand by the position we took in the brief, and that's the case. And I'm happy to discuss it. I do think what's more significant for this court is the developing law on disgorgement with the Lew decision from Justice Sotomayor and then the Gold decision in 2023 and then the Jarsky decision as it applies to civil penalties. But you are correct. And we've articulated in the brief why we don't think there was sufficient scienter, because our client had counsel, why there wasn't materiality, because not one person testified in trial that they relied upon the press release to make an investment. Not one. You don't have a single witness that relied upon the press release to make an investment. Can I ask, do you think the stock dilution is different than some of the other issues? I mean, much of your reply brief says that the alleged misrepresentations are periphery and corporate optimism and therefore not actionable. But is the stock dilution piece of that? Oh, yeah. So that's a very interesting question. I'm sorry. I didn't hear. So there's a difference between misrepresentation and dilution. This is not a scheme liability case. One of the issues we raised is the scheme liability was talked about, but that charge, that was never brought to the jury. So it's not a scheme liability case. It's a fraudulent misstatement case. And I don't think that the dilution was fraudulent. It's not a fraudulent misstatement. He was open and notorious in public statements about the dilution. So that is part of our position, that if we're talking about the fraudulent misrepresentations, the case has to be that someone made purchases based upon those. And you don't have a single witness, not a trial, Mr. Cass, TAS, and not any of the three unnamed witnesses in the affidavit can assert that they made a purchasing decision based upon the press releases. Not one. Not one. Sorry. You've reserved a couple minutes for rebuttal. Yes, I did. Thank you, counsel. Good morning, Your Honors. William Shirey for the Securities and Exchange Commission. If you have the joint appendix, I'd like to take the due process assertions and the Seventh Amendment assertions, because I think they're pretty easily dismissed if you just happen to have the joint appendix. Or I'll just reference two pages for you to follow up with. Turning to the due process argument, the sort of argument that they were blindsided somehow by changing them all with Goebel and the submission that the commission made. You'll see on page A-15-17, the commission offered, the district court judge was not satisfied, I think is the right word, with the commission's assertion that we would not be able to return the funds to armed investors, that we were having difficulty locating them. So the commission offers, at the bottom of page A-15-17, to actually go back and do a feasibility analysis. And the district court judge says, if you turn to page, the top of 15-18, I would like that. That is the beginning and the end of the due process argument. When you couple it with the fact that the district court judge gave the parties 30 days to submit additional material, and also included with that the ability of parties to come back to the court. It's a waiver argument that they didn't seek more, setting the Seventh Amendment question aside, they didn't seek more process. They were afforded, the district court judge told them at the end of the argument, if you want more process after the 30-day submissions, call chambers, we'll make this happen. They didn't. So, yes, it's a waiver argument, but also just a, there was, the process was laid out. They didn't avail themselves of it. So, the second argument on the Seventh Amendment argument, look, we stand by our briefing that Toll did not change the law. But more critically, I'd like to turn this Court's attention to another page in the joint appendix, 10 pages later, on page 15-27. And if you actually look at the discussion at the top, it's defense counsel for the trial. And defense counsel at the trial says, and I'm going to quote, the judge has, he's talking about the judge's ability to make fact-finding for civil penalties. He goes, the judge has, the courts have a lot of discretion in setting the penalties, and if there's no disgorgement, I think the court has discretion to factor that into the penalty amount. He's literally, the court has been asking, do I have the authority to make fact-finding? So, not only is it consistent with Toll, not only did Jarchese not change the law, but in any event, the parties here conceded, or the defendants here conceded, with respect to the civil penalties. That specific discussion is with respect to civil penalties. If I can turn quickly to the jury verdict, there's just a couple points I'd like to hit upon. First, the defendants keep referring to there's no evidence that any of the investors here relied on the actual statements. Reliance is not a component, critically, of a commission calls of action for an anti-fraud violation. It just simply is not. It's a question of, you know, is the loss or is the injury reasonably connected to the fraud here? And as the defendants talk about in their own brief, they actually say this in their opening brief, the injuries here occurred from the dilution that was going on. Second thing I'd like to point out, they said that it was open and notorious, the dilution. That is not true, and we talk about that in our brief. They continually refer to quarterly statements that were submitted or filed with the over-the-counter market. There was only one quarterly statement that was filed during this period. It did not, as we talk about in our opening brief, or excuse me, our response brief, did not talk about the amount of dilution that was going on. And more critically, it was filed in late February 2018. That was after several press releases about the buyback had already occurred. And finally, this is perhaps most critical, it wasn't introduced into evidence. So the dilution is the loss suffered by the investors, but what's the basis for the court then calculating disgorgement based on the amounts loaned by the financiers? So that actually gets a little bit to my last point I wanted to raise, which is the way that the fraud here worked. The fraud here was designed, as we talk about in our brief, to promote liquidity. It was essentially a modified pump-and-dump scheme. Rather than trying to drive up the price, it was trying to drive investor interest. And that was pumping investor interest so that the folks who were making the, the financiers who were giving the debt conversion loans would actually participate in them so that they could dump the heavily discounted shares so that there would be buyers to actually buy them. So that's the whole sort of causal connection here. So the loans that they received, the loans that were critical to keep the small little company going, that was the whole motive for the fraud here. And so that was the ill-gotten gains that Mr. Halleltron and Mr. Finley received. That's their ill-gotten gains, and that's what the district court reasonably found the disgorge. I wanted to make one last point about the scheme liability argument. I think it is, I hate to use this word, but it's just a complete red herring. The scheme liability evidence that came in was absolutely essential to the Section 17A2 claim here under the Securities Act. 17A2 requires a showing that money or property was received by means of the fraud. Well, the money or property here was these loans that we were just talking about. So the evidence was critical. It was also, as we talk about in our brief, that same evidence of the sort of general scheme that was going on, the pattern of the fraud here was also relevant to the motive and opportunity. And we talk about that in our brief. And finally, as we talk about lastly in our brief, defense counsel actually waived any argument to say anything about the scheme liability claims being dropped. Affirmatively said he had no intent. Didn't want a jury instruction with respect to it. He didn't want to raise it. Maybe he himself thought he had a win and wanted to walk away with it, and didn't want to be talking about schemes anymore. So if there are no further questions, I will see you the rest of my time. Thank you very much. Thank you, counsel. We'll hear about them. So I think, as I have some papers, I was not counsel at trial. And with respect to the scheme liability instructions, I've read the transcript. I do not know that that would constitute a waiver, but I understand counsel's point, and I wasn't there. I do know, however, that the way the affidavit was presented to the court was on a simultaneous exchange at the very end. And while counsel may have suggested to the court, you can do findings of fact based on the trial, and I think the judge did. If you read the judge's decision, there's plenty of findings of fact based on the trial. The findings of fact that give rise to the disgorgement calculations and the penalty calculations are found in this affidavit, never shown to the jury, never discussed in open court, never cross-examined, and it's those findings. What authority stands for the proposition that a penalty phase can't be based on an extended record? And I understand you can make a procedural due process argument with respect to the development of that record, but for the primary principle, what do you rely on? I mean, I've read Tull very carefully, and I think if you read that case, you'll find that there's no basis for additional findings of fact. There's basis for mathematical calculations and assessment based on the facts that were presented, and I think that's the problem. It's an understandable problem. I respect the SEC's position. They had a reverse course, but I don't think that that's good enough because the evidence upon which all the penalties, the bar, the civil penalties, the disgorgement, all based on this affidavit, which never, ever, ever saw the light of process. Thank you. Thank you both. We'll take the case under advisement. The remaining two cases, Johnson v. Hartford and Morales v. Local 32 BJSCIU, are on submission, so we will reserve decision in those cases. And that concludes our arguments for today, so I'll ask the court and deputy to adjourn.